Thank you, Your Honor. Leslie Weatherhead of Spokane for the appellant Metaxpert. Your Honor, we ask, or Your Honors, we ask that the order of the district court, granting in part and denying in part an injunction prayed for by Metaxpert, be vacated as to those parts in which the court denied injunctions related to competition in the computer gaming business and related to the continued possession by the appellee Richey and Gravity Jack of an account, an online web account, which is a source of business referrals, which is the property of Metaxpert. Well, now, as to computer gaming, why isn't it logical to conclude that the term is ambiguous? Your Honor, the term computer gaming is relatively self-explanatory. It's games on computers. What made it ambiguous in the mind of the district court was subjective evidence of a unilateral understanding or a unilateral intention that was submitted by Luke Richey, one of the appellees. That was the basis upon which the district court said it was ambiguous because Mr. Richey said, well, when I said computer gaming, what I really meant was PC computer gaming or personal computer gaming to the exclusion of presumably Macs, laptops, or certainly, in this case, mobile telephones. And so our position is computer gaming is a broad term. Yes, it is. And that's the term that the parties used. Now, under the law of contracts in the state of Washington, it's permissible to offer evidence of context. Had the evidence been in our business, everybody knows that when you say computer gaming, you're only talking about games played on PCs. And had there been evidence showing that that's an industry term of art, then we wouldn't be here. Then the district court would have been right under Washington law because it is permissible in Washington law to use that kind of context evidence to make what looks like an unambiguous term into an ambiguous term once you understand the context. But that was not the evidence that was put forward in this case. There is not one shred of evidence that anybody in the industry understands computer gaming to mean PC computer gaming. The context of their relationship, though. What were they building? What was their software for? They were building, well, Tomata, the record shows, is a custom software company. PlayXpert, the record shows, is a computer gaming company. And PlayXpert acquired Tomata because it wanted to get control of the processes by which custom software specific to the gaming aspect of its business. Were they designing custom software for PCs or laptops? Or for PDAs? Cell phones? The record shows it was both, Your Honor. They did games on telephones. They did games on personal computers. And that's in the record at, I think it's 216 to 219, where the, and in the declaration of Tyler Wilson, who describes games such as the Dexter Puzzle and something called Ice Squish. Are you urging us to accept the notion that the word computer, in the context of computer gaming, automatically includes smartphones? Yes. I'm saying it means any kind of computer. And I think it's recognized that a smartphone is a computer. The undisputed testimony of Mr. Manning in his declaration was that a smartphone is a computer. The definition in dictionaries of computer is a machine that stores and processes information. That includes smartphones. And I'll point out to you, excuse me. I carry a cell phone. It's a BlackBerry. Sure, it's got a lot of possibilities like a computer. But I would never call it a computer. The computer is the one that's on my desk. Now, this is a very, very simple analogy. But why wouldn't looking at it from the standpoint of what was in front of the district court in this case, wouldn't that be a reasonable distinction? Well, Your Honor, I would point to Mr. Ritchie's own declaration, in which Mr. Ritchie says, you know, I thought this meant subjectively PC computers, and I'm writing software for mobile phones, which he says is a different kind of platform. Platform. What kind of platform? That's shorthand for the expression computing platform. I mean, the fact of the matter is that your BlackBerry has access to the Internet like other computers. It processes data like other computers. You know, a functional definition of a computer, of necessity includes a BlackBerry, wouldn't include a dumb phone that doesn't process data. So I would submit to you that the use of the expression platform, which was semantically a shortening of computing platform, reinforces the concept that I'm suggesting to you that a smartphone is a computer. All right. But I think even sort of distilling things down, the process by which the court arrived at the conclusion that there was an ambiguity was itself as a matter of pure law an erroneous process. It was not permissible under Washington law, which governs under the terms of this contract, to accept subjective evidence from Mr. Ritchie as to his subjective intent. And I think, Judge, you asked about, well, what about the context in which the parties understood each other? And I think it's important to note that there's no evidence of that either. There's no evidence that says around the office when we talked about, hey, generate some software for a computer, we only meant a PC. In other words, the sole evidence that Ritchie offered was the evidence of his own subjective intent. And in Washington law of contract, that's not admissible to vary the generality of the term computer. Well, now, wasn't there conflicting evidence before the judge in this case, in terms of what each side understood? There was conflicting evidence, Your Honor. But I guess my point is that under the parole evidence rule, as applied in the state of Washington, that evidence couldn't be received to change the meaning of computer. Now, you know, should the court conclude that computer is inherently ambiguous, and that's the appellee's position, then obviously I can't prevail on that point. But it's our respectful submission that computer is not ambiguous. Computer has a uniform dictionary meaning, and I think a uniform common meaning in common parlance about what a computer does, what it is, what its function is. So we review the district court's decision for abuse of discretion. Yes, Your Honor. So it's your contention that he misapplied the law? Yes, Your Honor. That he applied a subjective understanding? Yes, Your Honor. In other words, I acknowledge that a decision to grant or withhold an injunction is a discretionary decision. But that discretion is, excuse me, the cases that we've cited on the standard of review tell us that discretion is abused as a matter of law if the district court's exercise of discretion is informed by an error of law. And so our position is that the district court's discretionary decision not to grant the injunction as to that aspect of the competition is informed by an error of law about there being an ambiguity in this contract and how you determine whether there's an ambiguity by reliance on extrinsic evidence. Okay. The second point, Your Honor, goes to this question about whether Ritchie had the right unilaterally to seize property which he had sold to Meda Expert. Now, the property in question is an account called the Rent-A-Coder account. It's undisputed that that was one of the assets sold to Meda Expert at the time Ritchie sold to Meda. But isn't there conflicting evidence with respect to the term, the termination date? There is, Your Honor. Now, the way that... Again, it's abuse of discretion. Yes. As my colleague mentioned. How do we sort that out? Well, we haven't focused on the issue that was disputed in relation to the Rent-A-Coder account. There were really, there were two things in the agreement of relevance. The Rent-A-Coder account was sold subject to a duty in Meda Expert to return it to Mr. Ritchie if two things happened. One, if his employment terminated before two years, and two, if he met the condition of supplying a release to Meda Expert. The court found a dispute of fact as to the date of determination, and we've recorded in our brief that we disagree with the court's determination, but we recognize that's a discretionary ruling by the court, that this court ought not to interfere with at this point. But number two, there was no evidence that the condition for the return of the Rent-A-Coder account was ever met. No effort was ever made to produce and deliver and tender to Meda Expert the release that the parties had agreed would be tendered. I thought there was some dispute about just that, that is, Ritchie offered to prepare it, and I forget what the other, Manning, I guess, said, no, I'll take care of it, and then never did. What Ritchie offered to prepare was a separation agreement, and Manning said, no, don't bother, or nope, it's not up to you to do that, or something like that. But there's no evidence that Ritchie was in any sense prevented from tendering the release that the parties had already negotiated as part of their original agreement. Was there an understanding of the content of the release? Yes, it's expressly laid out. I think there's four things that have to be in it, and it's expressly set out in the Asset Purchase Agreement, and none was ever delivered. And what Ritchie did is inconsistent with any suggestion that he was acting in good faith on some understanding that he had a legal right to return of the Rent-A-Coder account. He didn't make a demand of Meda Expert for the return of the account. He never said, you know, I've been terminated before two years, and here's the release, please turn it back to me. It's undisputed on this record that he surreptitiously used his access codes after he says he was terminated, which would then have been a violation of his duties under the confidentiality provisions of his employment contract. He used his access codes to go in and change all the data associated with the account so that the referrals coming through it would come to him rather than go to Meda Expert. That's not consistent with any suggestion that he acted lawfully. And so from the public interest perspective, the question is, do we want people surreptitiously seizing property so that they can have it and benefit from it while the legal process decides who the ultimate owner is? Why don't we wait for a final decision from the district court before even deciding? Your Honor, we won't have a trial date. The trial date was recently extended in part because of discovery problems caused by Mr. Ritchie until October of 2011. And during the interim, I mean, the whole point of the preliminary injunction was to seek protection from unlawful competition and to seek the return of a valuable asset that's being used and necessarily not being used by my client. Your Honor, I see I have about two and a half minutes left, and I'd reserve that for rebuttal. You may do so, counsel. Thank you. We'll hear from the appellee. Thank you. And may it please the Court, Michael Church, on behalf of Mr. and Mrs. Ritchie and Gravity Jack, Inc. As to the issue of the rent-a-coder account, the issue before the trial court, the district court, was whether or not MedExpert had met its burden to establish that it was the owner of the account. And there's three issues that the court looked at in making that determination. One was the date of termination. Two was this issue of release, which was addressed by the district court. And the third issue was an email that Mr. Ritchie provided with his declaration talking about a prior agreement with Mr. Manning concerning how the rent-a-coder account would be treated since there was two rent-a-coder accounts. The district court went directly to the employment agreement to address these issues, and the employment agreement seemed readily clear that if termination occurred within the first two years of employment, the rent-a-coder account would stay with Mr. Ritchie. It was under his name. It was under his prior company's name. What happened after he was terminated in October of 2009 is that MedExpert's employees went in, hacked the account, this is discussed in his declaration, and changed the passwords. He didn't do anything. He then went to the rent-a-coder owners and asked what had happened. Once he found out his account had been hacked, rent-a-coder went back and restored it to Mr. Ritchie, keeping in mind that rent-a-coder, during the time that it was hacking the rent-a-coder account, was under a two-year non-compete because they terminated Mr. Ritchie's employment within that two-year period. Now, the other part under Section D, 10D of the contract, talks about the release. The release is what the appellants have focused on for purposes of the appeal. But Mr. Ritchie very clearly was addressing that and was attempting to resolve that from October 23rd through October 26th. Specifically, at the record page number 78, he sends an email to Mr. Manning on October 23rd, specifically addressing those items and also specifically calling out the rent-a-coder account. He understands that this needs to be resolved. He's working towards resolution. We were in an equitable proceeding on April 9th, and the court looked at Mr. Manning's conduct as it related to this specific issue. Mr. Ritchie asked three separate times for an agreement, offered to Mr. Manning the opportunity to draft it himself because clearly he wasn't getting anywhere. Mr. Manning told him on October 26, it's not yours to do. Now, when the appellant didn't get the result they wanted at the district court, they want to switch the tables and pretend like Mr. Ritchie wasn't willing to address these issues, although we have three specific instances in the record where he asked for it and was told it was not his to do. To this day, Mr. Ritchie's never seen proposed release that was not his to do. At the April 9th hearing, the primary issue was the date of termination. There was substantial evidence that it occurred before the two-year term, which was November 20th. Mr. Ritchie testified that he was terminated on October 14th. There was a witness, Adam Chronister, who testified Mr. Manning himself reported in an employee meeting that it was on October 21st that he terminated Mr. Ritchie. We have the email string, which is part of Document 32, that shows that Mr. Ritchie was terminated. And we also have the testimony of Mr. Ritchie that he had met with Mr. Manning on October 19th to discuss the termination, and that's when the surprise came into Mr. Manning's eyes that the two years really hadn't run. And then there's the letter, the October 26th letter, which was at page 176 of the record, where Mr. Manning tells him that he's given him 30 days' notice, but as the 26th of October, he's done, and he's to return all the property to MedExpert on the 27th, the following day. The district court focused on Section 1.9 of the contract, which defines the termination date as being the last day the employee is employed by or providing services for the company. At the earliest, it was October 14th. At the very latest, it was October 26th, 25 days prior to the two-year mark. The court had sufficient evidence in front of it to find that the moving party did not meet its burden as to this particular issue. As far as the computer gaming issue is concerned, the real dispute came about here after we received the reply documents from MedExpert the night before the actual hearing was to take place. There is a dispute as to the terminology. I don't think it's a fair representation to say that we can take computer, and that term in isolation is separated from gaming, and come up with an unambiguous definition. The computer gaming business has a specific meaning, and it was undefined in the contract. What about Mr. Ritchie's comment that referred to platforms? You heard Mr. Weatherid's argument. Platform suggests it could be a PC on somebody's desk or it could be in some sort of a mobile device that has computer capability. The platforms are the various devices that allow gaming. Right. The different platforms are a PC, which is a computer, a handheld device, an arcade game, or a console, something that you play on your television. If I understood Mr. Weatherid correctly, he's saying that to the extent your own client referred to platforms, he is conceding that it's not just PC computer gaming, but it could be computer gaming on PDAs. Well, Mr. Ritchie goes farther than that. He talks about that this was discussed with Manning prior to the agreement ever going into place. This is on page 69 of the record, where he specifically states this was discussed. That's why we got here. And it's significant to note that the non-compete provision has two limitations. It has the carve-out for the computer gaming business, but it also has the provision in it that says Mr. Ritchie is prohibited from competing in any way with the company for the work he did while he was at the company. And Mr. Ritchie very specifically says that that is not the case. At page 68 of the record, he testifies at section 12, paragraph 12, that in paragraph 4 of the Declaration of Charles Manning regarding the preliminary injunction, he states that play experts... In line 14 and 15, the play expert develops software only for the PC computer gaming industry. Is that what you're saying? Builds software for the video gaming industry. And this is an important point because Mr. Manning does say at page 111 of the record that his software business is for the video game industry. The video game industry is the broad-spectrum, very general term that all these sub-parts, such as computer gaming, handheld gaming, console gaming, all come under. So he adds to the problem. He understands what this is and trying in his initial declaration to make it as broad as possible and avoid the limitation that's actually in the contract. Mr. Ritchie states that the only type of work that he did and that MetaXpert did is the PC computer gaming industry. So the argument of MetaXpert's a non-starter because he is not competing with the type of work that he did while he was at MetaXpert.  He goes on at paragraph 14 at page 69 of the record and states that his new business with Gravity Jack, this is at lines 9 through 11, we're not creating software for the computer gaming business. We're developing software for the mobile phone platforms. This is very different technology. At the preliminary injunction hearing, we were responding to documents and evidence we received the night before the hearing. We made an offer of proof to the court with regard to providing authoritative articles that defined these various complicated terms for somebody that's outside of the computer business. But with regard to the contract that MetaXpert prepared and the definitions that were provided in it, this computer gaming business is ambiguous. And therefore, the court was correct in finding that the defendants hadn't met their burden and the equities weighed in favor of Mr. Ritchie and Gravity Jack. Very well, counsel. Anything further? Nothing further, Your Honor. Thank you. Mr. White. Oh, question. In light of the deferred trial date, my colleague, Judge Visa, suggests that perhaps we should inquire if this is the kind of case that should be referred to our mediation. Or have you been there already? I don't know. Okay, all right. Very well. All right. Mr. Weatherhead, you still have a little time left. Thank you, Your Honor. I'll just make two quick points, if I may, Your Honors. First of all, as to counsel's representation to the court, that the computer gaming business has specific meaning in the industry. There is absolutely nothing in the record to support that statement. It just isn't supported by any of the evidence. Computer gaming means computer gaming. And I would note for the court that in these comprehensive agreements, there were numerous defined phrases. In other words, in this very agreement, the first, I think, page and a half, are these phrases with initial caps. Restricted customer means this. Market area means that. And they used these initial cap phrases throughout the agreement. These parties knew when they needed a specialized definition. And this one didn't have one. Computer gaming means simply computer gaming. Second, Your Honor. What about Mr. Church's point about paragraph 12 of the Ritchie Declaration, which specifically says, in fact, PlayXpert develops software only for the PC computer gaming industry. I was going to address that point myself next, Your Honor, because it's interesting. In this respect, the district court actually made a finding adverse to Mr. Ritchie and Gravity Jack on this point. And it's a little difficult to get there, but if you will refer to pages 215 and 216 of the record, you will see there, and I hope you got the color copies and not the black and white copy that I got, but in any event, you'll notice that those are images, I think they call them screen grabs or screenshots, of telephones bearing games, and the affidavits of Mr. Wilson and Mr. Hamad explain to you that the photograph on page 215 on the left is a puzzle game called Dexter, clearly on a telephone. And on page 16, there's a game, the photograph on the left, clearly on a telephone, is a game called Ice Squish. And those are identified more particularly in the declarations of Mr. Hamad and Wilson. Now, those were the images on the Gravity Jack screen, part of what MetaXpert sought by way of an injunction, and which the district court granted was an order requiring Gravity Jack to take down the representations that it had created those very games. Because Gravity Jack didn't create those games, those games were created by MetaXpert. And so the district court, in granting the injunction, requiring Gravity Jack to cease advertising that it had created those, what are obviously telephone games, clearly resolved against Gravity Jack the contention that PlayXpert doesn't do anything other than build PC computer games. Very well. Thank you, counsel. Thank you. The case just argued will be submitted for a decision, and the court will adjourn.
judges: Beezer, O'scannlain, Paez